## TEXAS INDEMNITY INS. CO. v. BONNER.

### No. 2899.

Court of Civil Appeals of Texas. Waco.

Feb. 23, 1950.

Rehearing Denied April 6, 1950.

Webster Atwell, Dallas, for appellant.

White & Yarborough, Dallas, W. E. Johnson, Dallas, for appellee.

LESTER, Chief Justice.

This is a case under the Workmen's Compensation Law, Vernon's Ann.Civ.St. art. 8306 et seq., appealed from the 68th Judicial District, Dallas County, Texas. A. L. Bonner alleged that in September, 1947, he was an employee of the City Ice Delivery in Dallas and was delivering ice from said company to what is commonly known as the Union Terminal Station; that he was driving or propelling a tractor used in hauling ice to be loaded on various trains; that said tractor went out of control and ran off the runway and down onto the railroad tracks, thereby causing his injuries, which resulted in total and permanent incapacity to work within the meaning of the Compensation Law.

Upon the jury's verdict of total and permanent disability the trial court entered judgment in accordance with the jury's findings.

Appellant appeals on three propositions. First, that the jury's finding of total and permanent incapacity and the judgment of the court so adjudicating were based upon no evidence in the record and against the undisputed evidence given by the appellee. Second, that the verdict of the jury finding total and permanent disability and the judgment of the court rendered thereon are so contrary to the great weight and overwhelming preponderance of the evidence as to be clearly wrong and to indicate that the jury returning said answers must have been influenced by some improper motive, bias, prejudice, sympathy or passion. As the propositions are so closely related they will be treated together.

Appellee Bonner, a colored man, testified that he, at the time of his injury, was working for City Ice Delivery in transporting ice from the company's place of business to the Union Terminal Station; that the ice was in blocks of 300 pounds each; that he had been and was at the time of his injury doing said work without difficulty; that before his injury he had never had any trouble with his back, that he could do a hard day's work. He further testified that since his injuries he worked for awhile for a hotel, parking cars at the garage, but he had to quit on account of his back hurting him so badly. He said he was not able to do this work but he was forced to do it and stood it as long as he could because he had to make a living; that he had always worked and would still work if he could. He said his wife ran a laundry and he "piddled around" in helping her, such as

wrapping and lifting small bundles which did not weigh over six or eight pounds; that he drove his car with a helper and picked up clothes and transported them to the laundry; that he suffered pain all of the time; that he was unable to lift anything of any size or weight. He said the only way he could get relief was by sitting on his right hip like he was then sitting, and sometimes when he got tired, placing his hand back and pressing this way (illustrating); that he couldn't sit level or sit over on the other hip and be comfortable. He testified on cross-examination that he had been in the radio repair work for something like seventeen years, and had maintained a shop for the repairing of radios for the last six or seven years and had done radio repair work up until about a year before the trial; that he was a good radio mechanic; that he was not unable to do radio repair work.

■ Appellant says that the testimony of Bonner concerning his radio repair work is in effect a judicial admission on his part that he is not totally and permanently incapacitated. The rule laid down by the Supreme Court and many other authorities is that an employee is not entitled to recover for total incapacity merely because he is unable to procure and retain employment in his usual occupation. The term implies disability to perform the usual tasks of a workman, and not merely the usual tasks of any particular one trade or occupation. Texas Employers Insurance Ass'n v. Mallard, 143 Tex. 77, 182 S.W.2d 1000, 1002. Two doctors testified in behalf of the appellee. Dr. C. C. Nash of Dallas, a specialist in the field of neuro-surgery, which covers the entire nervous system, the brain, spinal cord and bony coverings, and the nerves related thereto, testified that he had examined the appellee and it was his opinion that the appellee had a ruptured disc between the fifth lumbar vertebra and the top of the sacrum. He was asked: "When you examined this man, as far as the securing and retaining of employment, and performing the usual tasks of a workman, did you think he could do that?" "A. No, I don't think he can."

Dr. M. A. Schalck of Dallas, who treated the defendant for some time, testified that he could not give the appellee any permanent relief. He was asked: "What character of examination did you make of him?" and answered: "Just a general physical and clinical examination." "Q. What were your findings?" "A. My findings were there was a very pronounced contraction of all of the muscles of the lumbar spine, that is that part of the spine between the ribs and the hips, and he had a very spastic place in this general contraction over the fourth and fifth lumbar vertebrae, those are the last vertebrae in the backbone above the hips. I found he had difficulty in standing erect, he would lean to the right and complain of pain whenever I tried to force him or induce him to stand straight up. He would lean to the right and bend over somewhat. He had some difficulty in raising to his toes when he was standing, he had difficulty in doing that especially on the left side, and he couldn't walk on the toes at all without breaking down on his heels. He had a somewhat increasing amount of trouble in bending forward. In bending forward he would go about fifty per cent under the pressure of pain, and the pain would begin before he would bend as much as like this (illustrating), I would say that is about five or ten per cent, something like that; but when he got down to fifty per cent of normal then it would trouble him so he couldn't go any farther. Now, in laying down on his back on a table perfectly relaxed and keeping the knees straight and raising up on his heels, raising up ordinarily he should be able to get up to an angle of ninety per cent, that is, a right angle, he couldn't do that. Whenever he raised as much as six inches off of the table he would keep complaining and would get off of the table when I would force him to go more than that. That was worse on one side than on the other. It was much worse on the left side. On the right side he could stand to go about fifty per cent of the distance up, to forty-five degrees, but on the left side he couldn't, and he complained of deep pain in the region of the fourth and fifth lumbar

vertebrae and throughout the pelvis, and while he raised up that pain extended down the thigh." He further testified:

"Q. From your X-ray examination and your physical examination what conclusion did you reach about what was wrong with him, Dr. Schalck? A. Well, my conclusion was that he had some trouble with the disc between the fourth and fifth vertebrae, which was sufficient to cause a herniation of the nucleus with part of it going to the left side and part of it backwards so as to interfere with the nerves of the lumbosacral plexas, and that was where he was getting his trouble.

"Q. Did you find any spondylolisthesis? A. When I spoke of the first lumbar being forward on the sacrum that is described with the technical term of spondylolisthesis. Yes, he had that and the X-ray shows it.

"Q. When you examined this man, in your opinion was he able to secure and retain employment and perform the usual tasks of a workman? A. No, he wasn't able to do anything.

"Q. Did you consider his condition permanent or not? A. Yes, I do. I do yet."

The doctor was further asked:

"Q. A man with a ruptured disc, under the stress of economic necessity, can he do anything? A man can do work. A. When a man is totally disabled he can work if he has to. I mean a man is unable to work if he can't do it without excruciating pain.

"Q. It is in evidence this man completed what he was doing that night, but in pain. He was handling ice. A. Yes.

"Q. Would that indicate one way or the other in your opinion? A. If he is in pain while he is doing it he is not able to do it.

"Q. But a man can nerve himself up to do a lot of things he is not able to do, is that it? A. Yes, and shorten his life by doing it.

"Q. A man with that kind of condition ought not to be doing manual labor, should he? A. A man ought not to be doing any manual labor if it hurts him to do it. He isn't able to do it if it hurts him.

"Q. Is that a painful condition? A. That is painful in this sense, that this causes this (indicating) to fall down on that (indicating) and the nerves coming out here (indicating) are subject to pressure, and that isn't all, all of the stuff that is forced out of there (indicating) is forced against live lumbar nerves.

"Q. Assume that you have a ruptured disc, which I am sure you haven't, could you stoop down and pick up a tub with some water in it or not? A. It depends on how bad the rupture is. You could do it under pain.

"Q. I mean, could I do it? I am not asking whether it would hurt me. A. Yes, you could do it.

"Q. Would it hurt me if I do that? A. Indeed it would.

"Q. Should I do it? A. Not if it hurts you.

"Q. If I had a ruptured disc could I park cars? A. You can do it, yes.

"Q. Ought I to be doing it? A. No.

"Q. Would it aggravate the condition I have or not? A. It would aggravate it, and shorten your life, and you would lead a heck of a life while you did it."

He further testified that the appellee's condition was painful and that he considered his condition permanent.

The witness Mun Jones testified that he worked at the hotel garage while the appellee worked there. He said that appellee worked like something was wrong with him; that he appeared to be hurt, that he couldn't park cars; that he helped him do his work; that appellee got down in his back and couldn't stand up and he and another man carried him home; that he was out ten or fifteen days or more and when he returned he worked about six or seven hours and couldn't make it.

■ The appellee was not asked nor did he testify that he could do radio repair work without pain. He only testified that he was not unable to perform such work. The testimony shows that the appellee

drives his car, that he handles light bundles of laundry but it causes him pain. In view of his condition, can the appellee perform such work within the meaning of the Workmen's Compensation Law? Can he perform such work without suffering pain to the extent that it would not disqualify him from securing and retaining employment and performing the usual tasks of a workman, is the question. In view of the foregoing evidence, we are of the opinion that the testimony of the appellee that he had done radio repair work since his injury and that he was not unable to do radio repair work should not be an absolute bar to his recovery for total incapacity; that all of the evidence in this case created an issue of fact to be passed upon by the jury as to whether the appellee's injuries disqualified him from performing the usual tasks of a workman in such a way as to enable him to procure and retain employment. Nor do we think the verdict was against the overwhelming weight of the evidence or that such verdict reflects bias, prejudice or passion.

Appellant's third proposition is: "The argument of appellee's attorney was so prejudicial and inflammatory that no instructions from the court could have cured the error, and it cannot be said that no error resulted."

 The appellant had the Court Reporter to take down the argument of appellee's attorney and it has been transcribed and is now before this court. The appellant did not see fit to interpose any objection to any part of the argument at the time it was being made and raised his objections to it for the first time in his motion for a new trial. We find where the court, in one part of said argument, of its own volition admonished appellee's counsel and instructed the jury not to consider his remarks. While some of the

argument is outside of the record, there being no facts to support the same, we have read the argument and are of the opinion that it is not so inflammatory that its prejudicial effect, if any, could not have been removed by the court in admonishing counsel and instructing the jury not to consider it. But no objection was made thereto or request made of the court to instruct the jury not to consider it. If appellant, at the time the argument was being made, felt that its rights were being prejudiced, it should have at that time invoked the powers of the trial court, and should not be permitted to wait and see whether the verdict is favorable or unfavorable— if favorable, good and well, but if unfavorable it should not be allowed to complain that its rights have been gravely prejudiced. Was said argument objectionable to it at the time it was being made? If so, the court or opposing counsel was not informed of the fact. It remained silent until the verdict was rendered. We do not condone the practice of counsel going outside of the record in his argument, he should always stay within reasonable bounds. Counsel are more familiar with the facts of the record than anyone else, and when one begins to transcend reasonable limits to which he is entitled and which is objectionable to opposing counsel, he should at least make known his objections at the time and not wait until an unfavorable verdict has been rendered. Ramirez v. Acker, 134 Tex. 647, 138 S.W. 2d 1054, 1056; Baker Hotel of Dallas, Inc., v. Rogers, Tex.Civ.App., 157 S.W.2d 940, 944; First States Life Co. v. Mote, Tex. Civ.App., 110 S.W.2d 591, 592; McFadden Publications v. Wilson, Tex.Civ.App., 121 S.W.2d 430; Classen v. Benfer, Tex. Civ.App., 144 S.W.2d 633.

The judgment of the trial court is affirmed.