CONSOLIDATED CASUALTY INSUR-
ANCE CO., Appellant,

v.

Robert E. BAKER, Appellee.

No. 3402.

Court of Civil Appeals of Texas. Waco.

Dec. 20, 1956.

Rehearing Denied Jan. 17, 1957.

Baker, Botts, Andrews & Shepherd, Frank G. Harmon, II, Houston, for appellant.

Charles G. Lyman, Howard F. Sudduth, Corpus Christi, for appellee.

TIREY, Justice.

This is a compensation case. The jury found substantially (Issues 1 to 6 incl.) that appellee sustained personal injury to his body while in the employ of Sinclair Refining Company on the 18th of November 1952; that he sustained total incapacity on said date, and that it was permanent, and that such injury has not resulted and will not result in partial incapacity; and (Issue 12) that the weekly compensation will be inadequate to meet appellee's necessities, and that $50 weekly compensation will be adequate.

Appellee seasonably filed motion for judgment on the verdict of the jury, and appellant seasonably filed motion for judgment non obstante veredicto and motion to disregard answers of the jury to certain special issues, and in the decree we find this recital: " * * * the court proceeded to hear and determine said motions, and the court having heard argument thereon, and having reviewed the record in this cause, and the court having made such findings and conclusions as the court is authorized by law and by the facts, testimony and evidence in this cause to make, and the court being of the opinion and finding that plaintiff's motion for judgment is well taken, and that same should be in all things granted, and the court further finding that defendant's said motions for judgment non obstante veredicto and to disregard answers to certain special issues are without merit, and that same should be overruled and denied, and the court being further of the opinion and finding that plaintiff is entitled to the following judgment, order and decree, and that in accordance with the stipulations entered into in open court between plaintiff and defendant, that plaintiff's compensation should be awarded in a lump sum as hereinafter ordered" and decreed that appellee recover of appellant the sum of $8,795.23, with interest from date of judgment until paid at the rate of 4% per annum, together with costs of court, and apportioned one-third to attorneys for appellee as their fee.

Appellant seasonably filed its amended motion for new trial, and, it being overruled, perfected its appeal to the San Antonio Court of Civil Appeals, and the case

is here on transfer order of our Supreme Court.

Appellant assails the judgment on seven points. Points 1 and 2 are:

"Point 1: The trial court erred in entering judgment for the plaintiff for total permanent disability benefits, and in overruling defendant's motion to disregard the jury's finding of total and permanent disability, commencing on November 18, 1952, because there was no evidence to support such judgment and jury's finding.

"Point 2: The trial court erred in submitting the issue of total permanent disability to the jury and entering a judgment for the plaintiff on the jury's verdict for total and permanent disability benefits, and in overruling defendant's motion to disregard the jury's findings of total and permanent disability, commencing on November 18, 1952, and no partial incapacity, because the evidence was insufficient to support these findings by the jury, and such verdict was contrary to the overwhelming weight and preponderance of the evidence, including the admissions of the plaintiff and his medical witness that plaintiff was able to work at the same type of work which he had done prior to the accident, during a substantial period of time between the time of the injury and date of trial."

A statement is necessary. In appellant's brief we find substantially the following statement: Appellee went to work at the Sinclair Refining Company in Corpus Christi, Texas, in 1945 as a pipe fitter helper. He worked for them from that time through the time this case was tried on November 28, 1955. He claimed an injury to his back on November 18, 1952, and as a result of which he was off work from November 20th to November 23, 1952, and later from December 20, 1952 to January 18, 1953. He returned to work, but was off again from February 16, 1953 to March 8, 1953. He then worked regularly at his same job for Sinclair until he laid off on April 12, 1954 to have an operation on his back. Dr. Upshaw performed the operation and gave him a release to return to work for his employer and appellee did return to work on September 13, 1954. At the time appellee was injured on November 18, 1952, he was employed as a rackman helper; he continued in this same employment at all times following his injury except during the periods mentioned above, when he was off work. During the periods that he was off work he was paid compensation at the rate of $25 per week and he was also paid his regular wages by Sinclair the whole time he was off work. Upon his return to work on September 14, 1954, appellee went back to work as a rackman helper. He continued in this employment until December 23, 1954, when he experienced another back injury. Following this injury appellee was off work until February 6, 1955. During this period of time compensation checks were sent to appellee by appellant, but appellee did not cash these checks on the advice of his attorney. When appellee returned to work on February 6, 1955, the job of rackman helper had been abolished and he was put to work as a pipe fitter helper in the salvage shed. He continued in this employment, which included some work as a welder helper, dragline operator helper and dockman helper, down until the time this case was tried on November 28, 1955.

Prior to his accident on November 18, 1952, appellee had injured his back on several different occasions while working for Sinclair. His first injury occurred in 1946. As a result of this injury in 1946 appellee still had pain in his back in July 1949, and this condition continued on up until November 1952, when he hurt his back again in the injury which is made the basis of this suit. On the occasion of the previous back injury of July 1949, appellee was employed as a rackman helper, and following this previous back injury, he returned to work for appellant as a pipe fitter helper, doing

the same type of work which he did at the salvage shed from February 1955, until the time this case was tried. Following his back injury of November 18, 1952, appellee was off three days, from November 20th to November 23, 1952, and then he returned to his job as rackman helper until December 30, 1952. He was off from December 30, 1952 to January 18, 1953, and then returned to his regular job as rackman helper for approximately a month until February 16, 1953. He was then off from February 16, 1953 to March 8, 1953. Upon his return to work on March 9, 1953, he went back to his regular job as rackman helper and continued working every day on this job for over a year until April 12, 1954. At that time he was off work for an operation on his back, and stayed off work for some five months, returning to work on September 14, 1954. When he returned to his job on September 14, 1954, he went back to his regular work as a rackman helper and continued on this job until he had another accident on December 23, 1954. During all of this time that he was back at work appellee testified that he made as much overtime as he had before this accident; and that he was doing his regular job, including heavy lifting. It is true that the appellee testified he did get some help from a fellow employee in performing his work following the accident of November 18, 1952, and he admitted that he had also received help on this job prior to his accident. Following appellee's back injury of December 21, 1954, he was off work for some six weeks, returning to work for Sinclair on February 7, 1955. When he returned to work, the job as rackman helper had again been abolished, and he was assigned to the pipe department as a pipe fitter helper second class, working in the salvage shed. He was not assigned to light work and testified that he had worked in the salvage shed before when the job as rackman helper had been done away with on one occasion before the November 1952 accident.

During the time that appellee worked at Sinclair following his November 1952 accident, he worked regularly except for the specified periods he was off from work and for which he was paid compensation and full wages, and his average weekly earnings after the accident exceeded $78.29, which was stipulated to be his average weekly wages during the year next preceding his accident. During the year following the accident, November 18, 1952 to November 18, 1953, appellee worked 44 weeks as rackman helper, and earned $3,724.07, for average weekly wages while working of $84.63 per week. He took two weeks paid vacation. He was off work only six weeks, for which he was paid compensation at the rate of $25 per week, and also was paid his full salary by Sinclair. During the second year after his accident, November 1953 to November 1954, appellee worked 28 weeks as rackman helper, and earned $2,456.56, for average weekly wages while working of $87.73 per week. He took two weeks paid vacation and was off work for 22 weeks, for which he was paid compensation at the rate of $25 per week, and was also paid his full salary by Sinclair. During the third year after his accident, November 1954 to November 1955, appellee worked 44 weeks, five weeks as rackman helper and 39 weeks as pipe fitter helper, and earned $3,713.52, for an average weekly wage while working of $84.39. He took two weeks paid vacation, and was off work six weeks following his accident on December 21, 1954, during which time he was paid compensation at the rate of $25 per week, and was also paid his full salary by Sinclair.

Appellee also testified in part:

"Q. Mr. Baker, are you, or are you not, able to do the work you have done so far? A. I have been doing that work.

"Q. I don't care whether you have been doing it. Have you been able to do that work? A. I have been, so far. * * *

"Q. Mr. Baker, can you say for a fact, have you or have you not been able to do the work that is on the job

that you have held out there at Sinclair? A. Yes, so far. * * *

"Q. And you admit you have been able to perform the duties of that job so far, is that right? A. Yes. * * *

"Q. All right, and I believe you have already stated to me that you do not claim that you are not capable of performing the duties that you have performed, in fact, since this accident, isn't that right? A. Yes, sir. * * *

"Q. And all of the work assigned to you out there and which has been part of your job you have been able to do so far? A. So, far, I have been doing it.

"Q. And so far you have been able to do it? A. Well, I have been doing it.

"Q. Well, can you answer whether, yes, you have been able to, or have not been able to? A. Yes. * * *

"Q. Can you answer whether you are able to do it, Mr. Baker? A. Yes, sir, I have been. * * *

"Q. All right, so far then, since the date of this accident, the work on your job at Sinclair Refining Company has been reasonably suited to your physical condition, hasn't it? A. I didn't get you.

"Q. So far, since this accident, that is from the time of the accident up until now, the work which you have been assigned at the Sinclair Refining Company has been reasonably suited to your physical condition? A. Yes, sir, I think so. * * *

"Q. Mr. Baker, since this accident, you were able to get your job back at the Sinclair, were you not? A. Pardon.

"Q. I say, since this accident happened, you were able to get back your job at the Sinclair, were you not? A. Not my regular job, no.

"Q. Well, I think you worked as a rackman helper out there all during 1953? A. Yes, sir. I didn't understand exactly.

"Q. All right, but during that time you were able to get the same job back and hold it down, were you not. A. Yes, sir, with help.

"Q. All right, sir, and you have been able to get this particular job and hold it down so far, have you not? A. Yes, sir, with help.

"Q. All right, sir, and I believe you testified yesterday that you had had help before this accident, had you not? A. Yes, I had had.

"Q. From time to time prior to that, you had received help on the job? A. Yes, sir."

Dr. Barnes, orthopedic surgeon, testified that he examined appellee solely for the purpose of qualifying himself to give an opinion concerning his physical condition; that he saw him for the first time on October 22, 1954, almost two years after his injury of November 1952; that appellee had apparently had a fusion of the vertebrae in his lumbar spine, and that the fusion operation was necessitated because of "a mechanical unstable vertebra brought around by ascotos of the patient's lower back due to some former trouble, such as a compression injury upon that situation. In later life, the cushion at the lower last joints of the back had been broken and extruded;" that appellee had reached his maximum recovery, and was not in as good a shape as a man with a normal back; that he could not state whether appellee was, at the time of the trial, in as good a shape as he was prior to his back injury. With respect to appellee's condition at the time of the trial, Dr. Barnes testified that he would not pass him for employment doing heavy manual physical labor, but that his general percentage of disability to perform the usual tasks of a workman that generally involve lifting and such things was only 25%. He testified specifically:

"A. Well, these patients obviously should be restricted from heavy labor or having to lift large weights from one place to another, anything that would cause a twisting or bending work, such as electricians or pipefitter, similar tasks of light work, they actually can do, but, well, roughnecking in the oil fields would avoid it, not recommend that type of labor unless it happened to be an exceptionally young man who could be retrained physically, might possibly come back to that type of labor where they can do heavy work to use winches or such as that to do lifting or moving shelves of pipe, and I think there are many types of machines in shop work he could do very well; he is incapacitated, but he isn't completely out of the picture by any means.

"Q. If he could get that specific kind of work that his back would permit him to do? A. That is right, more and more efforts are being made to replace these people with work they can do. It is not very logical to me to do all of this work over somebody and say it is completely out of the picture. * *

"Q. All right, I see. Let's assume that when a man did apply for a job as a workman that would involve heavy lifting, etc., would you pass a man for that type of work, who is in the condition that Bob Baker is in now? A. No, sir, not for the heavy work, as I have stated before; I would pass him with restrictions, very definite restrictions. * * *

"Q. You wouldn't state, would you, Doctor, that at any time you have seen him now, he isn't physically and mentally capable of conducting his duties out there? A. I believe he could conduct his duties.

"Q. All right, sir. A. At least, I have never seen him in any critical situation over a back strain. I don't see why not, and I did the examination.

"Q. The first time he came to see you and on the basis as of those dates, you wouldn't say he wouldn't be physically able to do his duties? A. Yes, sir, he was doing a good job of that."

Evidence was tendered of a report made by Dr. Upshaw, the surgeon who performed the operation on appellee's back. This report was dated June 5, 1954 and was a part of the file of the Industrial Accident Board which was received in evidence. This report stated in part:

"The post-operative convalescence to date has been excellent. We would expect him to require an additional 12 weeks before he is able to return to work. It is our opinion that this patient will have eventually a permanent disability affecting the function of his lumbar spine of approximately 20%."

In appellee's brief we find substantially the following statement: Appellee had been in the employ of Sinclair Refining Company for seven years prior to the date he was injured in the line of duty; that he was engaged in the act of putting an outlet cap on a railway tank car when his foot slipped and he fell to the ground and struck his back along the edge of one of the railroad rails. In performing this task he was using a 36 inch pipe wrench, weighing approximately 40 pounds, with a piece of pipe attached to the end for additional leverage, and when he fell, striking his back against the rail, the wrench he was using fell across his stomach; that he suffered a severe pain in his back and a numbing sensation in both legs and he was unable to get up for about ten minutes; he then walked to the pump house, about 50 yards away, where he reported his injury to the pumper. He went to the first aid station, where he remained in bed until about 1:30 p.m., and during such time he was in sharp pain in the small of his back and his legs continued to have a numbing sensation; about 3:30 p.m. on the same day he was taken to the company doctor, where he was examined and treated. After being treated by the doctor he was

taken back to the first aid station, where he remained until about 4:30 p.m., when he went home. Appellee did not perform any of his duties on November 18, 1952, after his injury. On the day following his injuries appellee reported for work, but was still having pain as he did on the prior day, and was placed on light duties, the heavy labor usually performed by appellee as part of his duties on such occasion being done by the rackman. Appellee's condition grew worse during the course of the day; that night he used a heating pad and slept on a mattress reinforced with boards underneath it on the advice of his doctor. At the time of the trial appellee was still required to sleep on the same type of bed.

Appellee did not perform any heavy work on the second day after his accident and on the third day after his accident he was required to return to Dr. Draper for treatment, and at such time he was given medication and continued receiving treatments twice weekly until February 1953. Appellee continued to report for work from the date of his injury up until the time he was taken off of all duty by Dr. Draper in December 1952, but he did no heavy work while assigned to the rackman helper job and for a period of time he was assigned to the salvage shed doing light work, which is a job usually assigned to "a man that gets crippled up." Appellee testified in part:

"Q. You have been working all of the time you have been out there, haven't you, doing some particular job or other? A. Most of the time I have been out there, I have been working on little valves, refitting bolts, where I can set down; I put a bolt in the machine, and turn it on, and—

"Q. Somebody has to do that job, I suppose, don't they? A. Not necessarily.

"Q. They don't. A. They can throw those old bolts away.

"Q. How long have they had that salvage and rethreading of bolts and things? A. They have had that ever since I can remember.

"Q. And had somebody threading bolts, usually a man that gets crippled up? A. Yes, sir."

Appellee, about three weeks after his injury, started wearing a corset to support his back on the advice of the company doctor and he was wearing this corset at the time he was admitted to the hospital in February 1953. Thereafter, appellee was required to wear a back brace until May 1955, when he no longer wore the same on the advice of Dr. Upshaw, because of a skin irritation caused by the wearing of the brace. In December 1952, on the advice of Dr. Draper, appellee was taken off all duties at Sinclair for a rest of approximately six weeks, during which time appellee was being treated by Dr. Draper, and he began to feel a little better but he was thereafter returned to his regular duties as a rackman helper, where he attempted to do the manual labor expected of him, with the result that on the very first day his pains reoccurred. While appellee was assigned to this job he required assistance in performing his duties and received the help of the rackman. Although appellee had assistance, he continued to have severe back pains, and even attempting to do the light work appellee's condition got so bad that in February 1953, Dr. Draper, the company doctor, put him in the hospital and had traction applied to appellee's legs, which tended to relieve the pain as long as appellee was in the hospital. On the first day after his return to Sinclair he was assigned his regular duties as a rackman helper, but in attempting to do the work required of him, the pain in appellee's back and legs reoccurred to the same extent and severity as prior to his hospitalization. Appellee continued to work but again received assistance from the rackman in the heavy labor usually performed by him prior

to his injury of November 1952. Appellee continued to receive assistance from the rackman in the performance of his regular duties, and on the occasions when assistance was not had appellee's condition would worsen as a result of his attempting to perform his full duties. Testimony was tendered that appellee had, on occasions in 1946, 1949 and 1951, hurt himself, but he testified that he had lost no time from his job as a result thereof and that at the time of his injury on November 18, 1952, he was not suffering any incapacity or effects from any prior injury.

As a result of his injury in November, 1952, and his attempts to work thereafter, his condition got so bad that in March 1954 he again consulted Dr. Upshaw, who recommended surgery on appellee's back, the same suggestion that Dr. Upshaw had made in February 1953, shortly after appellee's injury of November 1952. Although requested to do so by Dr. Upshaw, who was the appellant's company doctor, the appellant failed to authorize or agree to pay for the operation recommended by Dr. Upshaw, and appellee had to undertake personally to pay for the operation on his own responsibility. In April 1954, Dr. Upshaw performed a surgical operation on appellee in connection with his injury, at which time he found a protruded lumbosacral intervertebrae disc and performed what is called a spinal fusion. It appears that Dr. Upshaw relied on his own examination and the results of x-rays taken by Dr. Draper on November 18, 1952, the day of appellee's accidental injury, which showed a unilateral sacralization of the fifth lumbar vertebrae with the false articulation on the left and a narrowing of the fifth intervertebral space. As a result of this operation appellee was off of all duties at Sinclair for a period of over five months on the advice of Dr. Upshaw.

In September 1954 appellee was returned to the rackman helper job at Sinclair, which was not suitable to appellee's physical condition, because he continued to have pain in his back, shoulders and legs. In spite of the pain he continued to work until December 1954, when, in attempting to lift an outlet cap weighing 80 to 90 pounds, which was part of his normal duties, his back pains became so severe that he was unable to straighten up. Appellee reported to the first aid station at Sinclair and was again taken to the hospital because of his back condition, resulting in his being off duty until the latter part of February 1955. Appellee was told by Dr. Upshaw to report to Mr. Killick upon returning to work in February 1955, after being discharged from the hospital for the third time subsequent to his injury on November 18, 1952. Dr. Upshaw told appellee he was not to lift anything, and at such time he was put on light work in the salvage shed at a lower job classification, being that of pipe fitter helper second class, which is the lowest job classification at Sinclair, and being the same job classification at which appellee started at Sinclair some ten years previously. Although holding the job classification of pipe fitter helper second class from February 1955 to date of trial, appellee testified that he was not able to perform the normal duties of such job, which, among other things, consists of putting pipe together and taking it apart, putting on and removing flange from pipe, carrying pipe, etc.; that he could not and did not do the regular duties of such job classification, but was working in salvage most of the time; that from February 1955 to the date of the trial appellee had not done any heavy work and the light work that he had been doing was at the expense of pain, as shown by the record: "Q. Are you able to do the work they have assigned to you now? A. Well, I have been doing it, but I have done it with pain and aches, suffering, but I have to make a living. Q. You have been able to do it so far? A. I don't know how long I will be able to continue." Appellee testified to the effect that he was of the opinion that the only job he was capable of performing at Sinclair was that of guard; that Dr. Upshaw had asked

Sinclair to put appellee on such a job, but there was no opening available, and, if available, would be filled by the Union through seniority bids. Testimony was tendered to the effect that while appellee was off duty as a result of his injury he received his regular pay in addition to workmen's compensation for a period of six weeks, and for a limited time thereafter he received only an amount not to exceed his regular salary, after which he was limited to the benefits of the workmen's compensation.

In October 1954, appellee was examined by Dr. George Barnes, who expressed the opinion that appellee was not ready to return to any type of strenuous work, and that such an operation as was performed on appellee by Dr. Upshaw produces a stiff back in the region of the operation, and was of the opinion that appellee would not have a normal back for a workman. Dr. Barnes re-examined appellee in January 1955 and in November 1955 and found slight change in appellee's physicial condition and was of the opinion that appellee had attained maximum recovery, and that appellee was not in as good a shape as a man with a normal back. As a result of his examinations of appellee, Dr. Barnes stated that in his opinion appellee could not do work of lifting weights of 80 to 90 pounds in the course of his work, and that if he attempted to do so he would probably have repeated back strain that would require his going to bed between alternating intervals of heavy work; that he would not pass appellee on a physical examination for a job requiring heavy lifting and would only pass him with very definite restrictions for light work. Dr. Barnes testified in part:

"Q. * * * let's assume then that a man did apply for a job as a workman that would involve heavy lifting and so forth, would you pass a man for that type of work who is in the condition that Bob Baker is in now. A. No, sir, not for the heavy work,

as I have stated before; I would pass him, with restrictions, very definite restrictions.

"Q. Which would restrict his endeavors to light work? A. Yes. Your question presents to us one of our big problems with these people, having to judge; these people are all turned down for new employment if they are adequately examined.

"Q. In other words, as a routine matter now, they are turned down for employment if they are in Bob Baker's condition? A. I know that they are under the employer's routine. * * * A. Yes, sir, these people are constantly rejected for new employment."

"Q. If you, as a doctor, were called upon by a prospective employer to examine Bob Baker at the time and to report to that prospective employer whether Bob Baker was physically qualified to take on a job that involved heavy manual physical labor, would you pass him for such job? A. No. * * *

"Q. But if these people were to go out and try to get jobs as workmen, they couldn't get them? A. No, not when a person goes out for new employment unless the jobs for the handicapped have been specifically created.

"Q. In other words, on the general market they don't have a saleable commodity as a workman? A. That is right. * * *

"Q. Yes, sir, and is he capable of going out and getting a job with a possibility of holding onto it? A. I don't believe so."

Testimony was also tendered to the effect that at the time of the trial he was 54 years of age and had only a fifth grade education. He had supported himself and his family by working at manual labor since he was 14 years of age. He does not

have the education or experience for any type of work except hard manual labor.

Since receiving his accidental injury on November 18, 1952, appellee cannot do any heavy work, and such light work as he has attempted during such time as he has not been confined to the hospital or taken off all duty at the request of his doctors has been accomplished only at the expense of pain and severe physical discomfort; however, in spite of such pain and discomfort appellee has attempted to continue his employment because it was the only means he had of making a living.

The testimony tendered in this cause is contained in three volumes and consists of more than 600 pages, including exhibits; however, we believe that the foregoing statement presents the most favorable part of the testimony relied upon respectively by appellant and appellee.

We think it pertinent to say that this record is without dispute that appellee was taken off of all duties at Sinclair on five different occasions after he received his injury and that on three of such occasions he was hospitalized.

■ Going back to appellant's Points 1 and 2, did the trial court err in entering judgment for appellee for total permanent disability benefits under the undisputed work record and evidence relating to appellee's activities as a laborer, and under appellee's own admissions? In arriving at an answer to this question, we are governed by the following rules: As a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3–B Tex.Jur. pp. 370 and 372. Moreover, "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the cir-

cumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9 (writ ref.). Moreover "'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable."'" See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, at page 199, point 6.

■ There is another general rule to the effect that "'the rule is well settled that the judgment of a trial court will not be set aside if there is any evidence of a probative nature to support it and that a court of civil appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings.' See Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972, 977; Woodward v. Ortiz, [150 Tex. 75] 237 S.W.2d 286. See also cases collated under 4 Tex.Digest, Appeal and Error, ■ ■ Burrus Mills v. Phillips, Tex. Civ.App., 260 S.W.2d 427, 430 (no writ history); see also Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88. However, there is one exception to the foregoing rule as set out by our Supreme Court in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, and especially in those cases where an assignment is made that the evidence is insufficient to support the findings of the jury, or that such verdict is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly unjust, and that the cause should be reversed and remanded by reason thereof. The statements of the Supreme Court in

the King Estate case, supra, are very clear, but the application of the rules there stated is not an easy accomplishment.

It is appellant's contention here that the work record of appellee, after he sustained his injury in November, 1952, is such that the verdict of the jury is so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust, and that the findings of the jury to the effect that appellee sustained permanent and total disability should be disregarded and set aside, and it relies on the decision of Texas Employers Ins. Ass'n v. Moran, Tex.Civ.App., 261 S.W.2d 855 (writ dis.) and authorities there cited. We do not believe the factual situation here before us brings this case within the rule announced in the foregoing decisions. First of all, it is a part of the public policy of our State that the Workmen's Compensation Act should be liberally construed. Our Supreme Court has consistently adhered to such views. See Hargrove v. Trinity Universal Ins. Co., 152 Tex. 243, 256 S.W.2d 73.

It is true that this record discloses that appellee had worked many days since his injury in 1952; in fact, it discloses a tenacity upon the part of appellee to work and earn a living, although he repeatedly had to have layoffs and hospitalization because of the injury sustained, and he finally submitted to a surgical operation to correct the injury he had sustained to his lumbar region. In fact, the record discloses that appellee made a heroic effort to do his full duty in trying to carry out the suggestions of the company doctors who advised him about his condition, but he continued to suffer pain and discomfort, and the jury had the right to believe his testimony under all of the facts and surrounding circumstances. It is true that evidence was tendered to the effect that he had a 25% disability, and another doctor said that he had a 20% disability, but opinion testimony does not establish any material fact as a matter of law. The medical testimony was only evidentiary and was not binding upon the trier of the facts. See Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345. Moreover, " * * * the law is well settled in this state that a workman is not necessarily precluded from recovering workmen's compensation benefits for a period of time in which he was gainfully employed by reason of working and earning wages following the date of injury." See Gulf Cas. Co. v. Jones, Tex. Civ.App., 290 S.W.2d 334, at page 339, points 3, 4, 5, and cases there cited. See also McGowan v. Pacific Employers Ins. Co., 5 Cir., 205 F.2d 533, points 1 and 2.

Going back to the voluminous testimony submitted to the jury, it is needless to say that the jurors were in a more favorable position to decide the controverted facts and weigh the evidence in this case than is this court. They had the opportunity of seeing the witnesses and listening to their testimony as well as observing the demeanor and attitude of the witnesses and at the same time to take into consideration all of the surrounding circumstances of each witness as he gave his testimony. Going back to Dr. Barnes' testimony, which we have previously set out in part in question and answer form, we think the jury had a right to find under his testimony, together with all of the other facts and surrounding circumstances disclosed by this record as a whole, that appellee was permanently and totally disabled. This view, we believe, is in accord with the approved definition of the term "total incapacity" by our Supreme Court in Texas Employers Ins. Ass'n v. Mallard, 143 Tex. 77, 182 S.W. 2d 1000, at page 1001, where that court approved the following definition: " 'The term "total incapacity" (or total disability), as used in this charge, does not imply any absolute disability to perform any kind of labor, but a person disqualified from performing the usual tasks of a workman, in such a way as to enable him to procure and retain employment, is regarded as being totally incapacitated, or totally disabled.' " We think the jury had the right to believe and find from all of the evidence that appellee had sustained a total and per-

manent injury to his back. The fact that he was willing to work to earn a livelihood and suffer pain does not take away from him the benefits provided under the provisions of the Workmen's Compensation Act, art. 8306 et seq., V.A.C.S. It is our view, after a careful consideration of this record as a whole, that the findings of the jury are not so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust, and appellant's Points 1 and 2 are overruled. See also Texas Indemnity Ins. Co. v. Bonner, Tex.Civ.App., 228 S.W.2d 348 (n. r. e.).

Appellant's third point is:

"The trial court erred in refusing to deduct from the amount of compensation awarded to the plaintiff, any compensation during the period of time that plaintiff continued in the employ of Sinclair Refining Company and worked for Sinclair Refining Company at employment admittedly suited to his physical condition and capacity, and was paid wages equal to or greater than his average weekly wage during the year next preceding his accident, because the defendant, as compensation insurance carrier for Sinclair Refining Company, plaintiff's employer at the time of his accident, is entitled to a credit or offset for the period of time during which the plaintiff actually worked for the same employer and drew the same or greater wages following his accidental injury, and is not, as a matter of law, obligated to pay compensation for such period of time, under the provisions of the Texas Workmen's Compensation Act."

Appellant's fourth point is:

"The trial court erred in sustaining plaintiff's exceptions to defendant's pleadings and refusing to submit defendant's requested issues on its *credit* theory." (As we understand the record, such compensation as was paid to appellee by appellant was taken into account in the final judgment.)

Since we are of the view that appellee sustained total permanent disability and was not able to do the work he was doing before he sustained such injuries without suffering pain and discomfort, we overrule appellant's contentions on the authority of Texas Employers Ins. Ass'n v. Mallard, supra; Texas Indemnity Ins. Co. v. Bonner, supra; Gulf Casualty Co. v. Jones, supra, and McGowan v. Pacific Employers Ins. Co., supra. See also Anderson v. Whittaker, Ky., 247 S.W.2d 980 and cases there cited; Mottet v. Libby-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218; Anderson v. Cowger, 158 Neb. 772, 65 N.W. 2d 51; McGhee v. Sinclair Refining Co., 146 Kan. 653, 73 P.2d 39.

We have carefully considered appellant's Points 5, 6 and 7, and we are of the view that they do not present reversible error and each is overruled.

Because we are of the view that appellant has failed to show reversible error, this cause is in all things affirmed.

HALE, J., took no part in the consideration and disposition of this case.