**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**L. E. BROWN, Appellee.**

No. 3496.

Court of Civil Appeals of Texas.

Waco.

Jan. 9, 1958.

Rehearing Denied Jan. 30, 1958.

Ramey, Calhoun, Brelsford, Hull & Flock, Tyler, Joe R. Carroll, Palestine, for appellant.

Gallagher, Francis, Bean, Wilson & Berry, Akin & Vial, Dallas, B. R. Reeves, Palestine, for appellee.

TIREY, Justice.

This is a compensation case. The jury in its verdict found (1) that plaintiff sustained an injury to his back on or about June 4, 1955, (2) and that such injury was accidental, and (3) that he was an employee of The Borden Company at such time, and (4) that such injuries were received in the course of his employment for such Company; (5) that such injury did not naturally result in total incapacity to labor; (6) not answered pursuant to instructions; (7) "Do you find from a preponderance of the evidence that said total incapacity to labor, if any, is permanent?", to which the jury answered "No"; (8) "Do you find from a preponderance of the evidence that said total incapacity to labor, if any, was not temporary? Let the form of your answer be 'It was not temporary' or 'It was temporary'", to which the jury answered "It was not temporary"; (9) not answered pursuant to instructions; (10) "Do you find from a preponderance of the evidence that L. E. Brown has sustained or will sustain a partial incapacity to labor as a natural result of the injuries he received on June 4, 1955, if any you have found?", to which the jury answered "Yes"; (11) "What do you find from a preponderance of the evidence to be the percentage of such partial incapacity to labor, if any, during the continuance thereof? Answer by stating the percentage," to which the jury answered "75%;" (12) "Do you find from a preponderance of the evidence that such partial incapacity to labor, if any, is permanent?", to which the jury answered "No"; (13) "Do you find from a preponderance of the evidence that said partial incapacity to labor, if any, was not temporary? Let the form of your answer be 'It was not temporary' or 'It was temporary'", to which the jury answered "It was not temporary"; (14) that partial incapacity to labor began on February 8, 1955; (15) not answered pursuant to instructions; (16) "Do you find from a preponderance of the evidence that there was an employee of the same class as plaintiff, L. E. Brown, who worked substantially the whole of the year immediately preceding June 4, 1955, in the same or in a similar employment as that engaged in by L. E. Brown at the time of his injuries, if any, on June 4, 1955, either in the same place or a neighboring place to that at which L. E. Brown was working when injured, if he was injured?", to which the jury answered "No"; Issue No. 17 made inquiry as to the average daily wage or salary of the same class as plaintiff working substantially the whole of the year immediately preceding the date of plaintiff's injuries and was unanswered; (18) that the average weekly wage of plaintiff that would be just and fair to both parties would be $55; (19) that plaintiff was not entitled to a lump sum settlement; (20) that plaintiff's incapacity to labor is not due solely to congenital defects, disease or unusual suscep-

tibility thereto, or any combination of such things unrelated to such injury; (21) that R. B. Cathey received notice of the injury within thirty days from June 4, 1955; (22) that at the time plaintiff gave notice of said injury to Cathey that Cathey was an employee of The Borden Company; (23) "Do you find from a preponderance of the evidence that L. E. Brown reasonably believed until about the time that his notice of injury was given on February 15, 1956, that the injury received by him on June 4, 1955, if any, was not serious and would not disable him?", to which the jury gave no answer; (24) that plaintiff failed to give such notice of his injury on account of the belief that his injury was not serious and would not disable him not answered; (25) "Do you find from a preponderance of the evidence that a reasonably prudent person would, under the same or similar circumstances, by reason of such belief have delayed the giving of such notice until February 15, 1956" was not answered; (26) that plaintiff reasonably believed until about the time that his claim for compensation was filed on February 15, 1956, that the injury received by him on June 4, 1955 was not serious and would not disable him; (27) and that he failed to file such claim on account of such belief; (28) and that a reasonably prudent person would, under the same or similar circumstances, by reason of such belief, have delayed the filing of his claim until February 15, 1956.

In the judgment we find this recital:

"The Court makes the following findings regarding the jury's verdict: 1. The finding of the jury in answer to Special Issue no. 13 that plaintiff's partial incapacity 'was not temporary' was tantamount to a finding by the jury of permanent partial incapacity to labor, considering the definition of 'temporary.' 2. Viewing the answer of the jury to Special Issue No. 13 with the answer to the remaining issues, it is apparent that a verdict for plaintiff for seventy-five percent permanent partial incapacity to labor was intended to be found by the jury and the issues were answered by the jury in a manner clearly sufficient upon which to base a judgment for the plaintiff for such period of time.

"Under the pleadings, evidence and verdict of the jury filed herein, the Court is of the opinion that the plaintiff's motion for judgment should be granted and that the plaintiff, L. E. Brown, is entitled to recover judgment against defendant, Texas Employers Insurance Association, for the payment of compensation for the full period of 300 weeks from and after February 8, 1956, at the rate of $24.75 per week with interest thereon at the rate of 4% per annum on all past due installments of compensation from maturity until paid, the jury having found that the plaintiff's average weekly wage for the purpose of computation of the compensation rate to be $55.00; the Court further finds that there is now, and was on January 16, 1957, past due, accrued and unpaid 49 weeks of compensation due the plaintiff in the total sum of $1212.75 with accrued interest to January 16, 1957 in the sum of $22.39, making the total amount of money due plaintiff as of January 16, 1957, $1,235.-14."

and the court decreed accordingly. The court further decreed that the decision and award of the Industrial Accident Board heretofore made on the 18th of April, 1956 be in all things set aside and held for naught. The court then fixed the share that plaintiff's attorneys were entitled to receive of the judgment and granted plaintiff's motion for judgment and overruled defendant's motion for judgment non obstante veredicto, as well as defendant's motion to disregard certain jury findings and to enter judgment for defendant, as well as defendant's motion for mistrial because of conflict in the jury's answer to special issues, and defendant's amended motion for new trial. Defendant perfected its appeal to the Houston Court of Civil

Appeals and the cause is here on transfer order of our Supreme Court.

The decree is assailed on four points. They are substantially: The court erred because (1) plaintiff failed, as a matter of law, to show good cause for not filing his claim for compensation within the statutory period; (2) that the evidence showed, as a matter of law, that plaintiff was not an employee of the Borden Company at the time of his accident, and that R. B. Cathey was not an employee of the Borden Company when plaintiff claimed he notified Cathey of his accident; (3) in the alternative, the judgment should be reformed so as to allow plaintiff a recovery for 75% partial incapacity from February 8, 1956 until September 28, 1956, since this is the only judgment that would reconcile the jury's answers to Issues 12 and 13; (4) in the alternative, the judgment should be reversed and remanded because of a fatal and irreconcilable conflict between the jury's answers to Issues Nos. 12 and 13.

Before discussing each of appellant's points, we think it is pertinent for us here to say that as a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3–B Tex.Jur. pp. 370 and 372. Moreover, "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points

8 and 9, writ ref. Moreover, " 'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' " See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, at page 199, point 6. No rule is better settled than the one to the effect that if there is evidence of probative value to sustain the findings of the jury, the appellate court is bound by such findings. See Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, point 3 (no writ history) and cases there collated. See ICT Insurance Co. v. Gunn, Tex.Civ.App., 294 S.W.2d 435 (n.r.e.) point p. 441; Continental Cas. Co. v. Baker, Tex.Civ.App., 297 S.W.2d 706 (n.r.e.).

Evidence was tendered to the effect that plaintiff answered an ad in the Palestine paper, which ad read as follows:

"Male help wanted
If you are between the age of 25–35, married, and want a job, call me at 3–1117."

In response to this ad he contacted R. B. Cathey, and Cathey stated to him that Borden needed a driver on a truck but before he could tell plaintiff about the job that Cathey would have to talk to the route supervisor, Durward Dean, who was at that time driving the truck himself. Plaintiff saw Dean the next day and on the next day Dean asked plaintiff to ride with him and see how to run the route and meet the customers; that the truck had "Borden's" written on it; that on that occasion Dean told plaintiff "to get out and really hustle and get new customers and showed me how to put the bills down, how to make out bills, and each delivery we would make he would show me how to do the book work and all that." Dean also gave him the names and addresses of the customers and introduced him around to the customers. Dean told plaintiff that he would be paid 10% of what he sold; that plaintiff sold other Borden's

products and the bottles had Borden's written on them; that Dean rode with plaintiff about five days and told him how to bill the customers. Plaintiff's Exhibit No. 1, which was introduced in evidence, was a bill which was submitted by Borden and it carried Borden's Tyler address and telephone number on it and it did not mention either the name of plaintiff or Cathey; that Borden permitted him to extend credit to some of the customers, and checks which were received were made out to the Borden Company, and plaintiff was furnished a truck by Borden from Tyler, which truck did not have Cathey's name on it; that plaintiff saw Dean on at least two occasions on plaintiff's route and once at Cathey's home, and at these times the discussions concerned plaintiff's route, the customers, and getting different products on there to sell; that after being injured he reported the injury to Mr. Cathey and then went to Dr. Felder; that plaintiff was paid by Mr. Cathey with Mr. Cathey's personal check and Borden's name did not appear on the check; that plaintiff was paid every two weeks; that Mr. Dean told plaintiff that Mr. Cathey was taking care of that end of the county for Borden; that plaintiff followed the route that Dean had instructed him to follow and started and stopped where Dean had told him to start and stop.

Burtis Crawford, who assisted plaintiff on his route, testified that Borden's name appeared on the truck; that he did not see Cathey's name on the truck, and that checks were made out to Borden.

F. M. Hargrave testified that Borden's name appeared on the truck and a cow's picture was also on the truck.

M. S. Davis, manager of Borden's branch office in Tyler, Texas, which is in the southern district, testified that Cathey would have been relieved of his territory if he handled any other territory and that Cathey used his own trucks bought from Borden (See Houston News Co. v. Shavers, Tex. Civ.App., 64 S.W.2d 384, writ ref.); that Cathey had been manager for Borden at Tyler prior to moving to Palestine; that Cathey was limited to the Palestine territory and that Borden financed Cathey; that Borden has facilities for men to buy uniforms and pay them out; that Dean is the retail sales manager for Borden, and Palestine is under the jurisdiction of the Tyler plant; that the Tyler office conducts sales meetings and independent distributors are invited to attend; that Borden requires that the name of the independent distributors appear on the truck; that this is carefully watched and the independent distributor would not be around if he failed to put his name on his truck; that Cathey would send all money in, and Borden would send him his portion of it twice monthly.

Earl Elrod testified that the trucks had Borden Milk Truck on them.

Mrs. Brown, plaintiff's wife, testified that the word "Borden's" was on the truck and a picture of a cow.

Cathey testified that the Borden Company financed his truck and he was paying notes for the trucks to Borden on June 4, 1955; that he paid Borden $10 a day for Dean to teach plaintiff the route, and that Dean went out with plaintiff for about thirteen days showing him how to deliver, how to keep books on the route and how to follow the route; that all customer checks were made out to the Borden Company, and all bills were made out on Borden Company forms as set forth in plaintiff's exhibit No. 1; that Cathey paid plaintiff by his personal check and that he paid plaintiff's Social Security and collected withholding tax; that he hired plaintiff and that he had placed the ad in the paper; that he and Cathey went to sales meetings at the Borden Company in Tyler together; that Cathey handled only Borden Company products; that when a new man takes over a route, Borden loans Cathey its employees; that Borden would not want anyone else to sell their products where Borden was already selling them; that he had to stay in line on prices; that he sends checks and cash to Borden Company and then Borden pays Cathey; that Borden furnished him with literature and he wears the Borden Company uniform and on occasion Borden has bought uniforms and taken it out of his

salary; that Borden got Brown's uniforms and then Brown paid for them by bi-weekly deductions from his checks.

With reference to the injury sustained by Brown, testimony was tendered to the effect that on June 4, 1955 at about 3:00 P. M., plaintiff was waiting on a customer and picked up a case of milk to move it in order to get the kind of milk that the customer ordered; that when he picked up the case of milk from the floor of the truck and started to turn around, his feet slipped out from under him due to the floor being slick with water and dirt; that he fell backward striking the lower part of his back on the step of the truck; that after having so struck his back it felt very painful; that plaintiff told his helper he would be all right in a little bit; that they made one more delivery and then came in and unloaded the milk bottles and took the truck to Mr. Cathey; that plaintiff then reported the injury to Mr. Cathey and then went to Dr. Felder that afternoon; that when he arrived at Dr. Felder's office his back felt pretty painful and the doctor prescribed medicine for him but took no x-rays; that the next day was Sunday and he did not work; that plaintiff went back to his job on Monday and continued to work for two weeks, at the end of which time he quit; that he was having difficulty in doing his work; that plaintiff was then without a job for thirty or sixty days and then he went to work for a service station; that plaintiff worked at the service station for about three weeks, waiting on cars and putting gas in them; that in September 1955 plaintiff went to see Dr. Farnsworth because his lower back kept hurting; that Dr. Farnsworth examined him and gave him an adjustment; that it did some good for awhile; that about the first of October 1955 plaintiff started to work in a jewelry store and pawnshop; that about February 8, 1956 plaintiff returned to Dr. Felder because his back kept hurting him and the pain was going down in his left hip and leg; that this was the first time that he had noticed any leg pains; that after seeing Dr. Felder his condition continued to

get worse and he employed attorneys on February 14, 1956; that his claim for compensation was prepared while at his attorney's office on February 14, 1956, and the claim was filed with the Industrial Accident Board on February 15, 1956; that on February 14, 1956 plaintiff went to Dr. Schoolfield's office at the direction of his attorneys, which doctor examined and x-rayed plaintiff; that when Dr. Felder made his first examination of plaintiff he advised plaintiff to quit lifting and he would be all right in a short while; that plaintiff quit his job with the Borden Company on Dr. Felder's advice; that plaintiff did not go back to Felder until February 1956 and between that examination and the first examination in June 1955 plaintiff had good and bad days; that he had bad days during the whole period but figured that in a matter of time he would be all right; that he did not do any lifting during the two weeks that he continued on his milk route; that he did not do any lifting because he was relying on Dr. Felder's telling him not to lift; that on some days he felt that he would be all right and his back would not bother him, then he would not feel so good in getting around and in different things; that he had a little trouble with his back now and then through the rest of 1955; that he had confidence in Dr. Felder and thought he was a good doctor; that he thought he was getting better until the first part of February 1956; that the pain started down his hip and leg in the first part of February 1956; that his hip had hurt a little in the middle of the summer of 1955, but his leg did not start hurting him until February 1956; that the hip pain which he had in the summer of 1955 was not enough to go to the doctor.

Dr. Schoolfield testified that he thought the pain felt by plaintiff in his leg could reasonably appear eight months after plaintiff fell; that the reason for this was that the joint was not used as much at first and the pressure on the nerve was not as great as first experienced after the injury.

Plaintiff's wife further testified to the effect that Mr. Brown looked bad im-

mediately after his injury and that he had good and bad days for the next two weeks; that after quitting his milk route work it was about sixty days before plaintiff returned to work, at which time he went to work at a filling station for about three weeks; that plaintiff went to see Dr. Farnsworth in September 1955 and showed improvement for awhile after having gone to Dr. Farnsworth; that he started to work at Morris Jewelry & Pawnshop in September or October 1955; that plaintiff complained of pain in his back while working for the jewelry shop but his leg did not begin hurting him until February 1956, after which time he went back to see Dr. Felder.

Mr. Cathey testified that plaintiff told him that it was possibly his kidneys that was giving him the back trouble.

■■■ Going back to appellant's first point, does the evidence tender the issue of good cause for plaintiff's failure to file his claim, and is the evidence of sufficient probative force to sustain the jury's findings thereon? We think the answer to each of these inquiries is "Yes." First of all, Sec. 4a of Art. 8307, RCS of Texas, 1925, Vernon's Ann.Civ.St. art. 8307, § 4a, requires that claim for compensation with respect to an injury shall be made within six months after the occurrence of the injury, but "for good cause the Board may, in meritorious cases, waive the strict compliance with the foregoing limitations as to notice, and the filing of the claim before the Board." Much has been written on what constitutes good cause, but we believe that one of the clearest and most comprehensive statements by our Supreme Court is found in Harkey v. Texas Employers' Ins. Ass'n, 146 Tex. 504, 208 S.W.2d 919, 921: "There are several distinct factual bases for good cause under Art. 8307, sec. 4a, R.S.1925, Vernon's Ann.Civ.St. art. 8307, sec. 4a. Claimant's belief in good faith that his injuries are not serious is one, provided a reasonably prudent person in the same or similar circumstances would have delayed filing his claim. * * * And while such

belief continues the fact that almost constant pain exists does not affect the issue; since pain and suffering are not compensable. * * * Advice from a physician that his injuries are not serious constitutes good cause for failure to file a claim within the prescribed time, provided the claimant, in the exercise of ordinary care, believes and relies upon that advice." It is our view that the factual situation here brings the claimant within the above rule, and the jury so found. See also Hawkins v. Safety Casualty Co., 146 Tex. 381, 207 S.W.2d 372 and American Motorist v. Boortz, 5 Cir., 197 F.2d 900.

■■■ Going back to appellant's second point, does the evidence show as a matter of law that plaintiff was not an employee of the Borden Company at the time of the accident, and that Cathey was not an employee of the Borden Company when plaintiff claimed he notified Cathey of his accident. Our view is that it does not in each case. Much has been written by our Courts of Civil Appeals and our Supreme Court upon this question, but we believe one of the clearest statements of the rule is found in Halliburton v. Texas Indemnity Insurance Co., 147 Tex. 133, 213 S.W.2d 677, 680, wherein Mr. Justice Taylor, speaking for the Supreme Court, used this language: "If one contracts to do a specific piece of work for another and furnishes, and has the absolute control of, his assistants, and the work is done in accord with his own ideas, or with a previously agreed plan, without being subject to the other's orders with respect to the details of the work, he is an independent contractor. *However, if he and his assistants are subject to the control of the other party with respect to the details and method of doing the work then he is an employee. The supreme test in determining whether one is an employee or an independent contractor, according to our decisions and most of the modern cases, is the test with respect to the right of control,"* (emphasis ours) citing a long list of cases. We have reviewed the testimony tendered and we are of the

view that after considering this testimony in its entirety, under all of the surrounding facts and circumstances, that a jury question was tendered under the foregoing rule as to whether plaintiff was an employee of Borden and whether Cathey was an employee of Borden, and that the evidence is sufficient to sustain the finding of the jury thereon in each instance. As we understand our decisions, our Supreme Court has not seen fit to change the above rule.

Appellant in its third and fourth points says that in the alternative that the judgment should be reformed so as to allow plaintiff a recovery for 75% partial incapacity from February 8, 1956 until September 28, 1956, because this is the only judgment that would reconcile the jury's answers to Issues 12 and 13, and that the judgment should be reversed and remanded because of a fatal and irreconcilable conflict between the jury's answers to Issues Nos. 12 and 13.

In the transcript we find the following certificate signed by the trial judge:

"Be it remembered that after the Court had given the instructions to the jury directing the attention of the jury to the conflict in its answers to Special Issues Nos. 5 and 7 with its answers to Special Issues Nos. 10, 11, 12 and 13, the defendant then objected to the giving of such instruction by the Court, 'for the reason that there is no conflict between the issues as dictated by the court and the only conflict in any of the issues mentioned is between Special Issue No. 12 and Special Issue No. 13.' The jury then returned to the jury room, resumed its deliberations, and then returned in open court its verdict. Before the Court received this verdict, he inquired of counsel for the plaintiff and for the defendant if there were any conflicts in the answers contained in the jury's verdict. Counsel for the plaintiff stated to the court there was no conflicts. Counsel for the defendant told the Court that he had

not had time to sufficiently check all of the answers, the Court then stating that he was not asking for a formal statement to waive anybody's rights, whereupon counsel for the defendant stated that he did not see any conflict at that time. The Court then received the verdict, and neither the counsel for the plaintiff nor the counsel for the defendant objected to the Court's receiving the verdict.

"The above has been examined, found correct, approved, and ordered filed as a part of the record in this cause on the 8th day of March, A.D. 1957."

Going back to the court's charge, we find that the issues referred to in the certificate are as follows:

"5. Do you find from a preponderance of the evidence that the injury sustained by the plaintiff, L. E. Brown, if any you have found, on or about the 4th day of June, 1955, naturally resulted in total incapacity to labor? Answer 'Yes' or 'No,'" to which the jury answered "No." "* * * If you have answered Special Issue No. 5 'Yes', then only in such event answer:

"7. Do you find from a preponderance of the evidence that said total incapacity to labor, if any, is permanent? Answer 'Yes' or 'No,'" to which the jury answered "No."

"10. Do you find from a preponderance of the evidence that L. E. Brown has sustained or will sustain a partial incapacity to labor as a natural result of the injuries he received on June 4, 1955, if any you have found? Answer 'Yes' or 'No,'" to which the jury answered "Yes."

"11. What do you find from a preponderance of the evidence to be the percentage of such partial incapacity to labor, if any, during the continuance thereof? Answer by stating the percentage," to which the jury answered

"75%." "If you have answered Special Issue No. 10 'Yes' and only in such event, then answer: (The jury did answer No. 10 "Yes").

"12. Do you find from a preponderance of the evidence that such partial incapacity to labor, if any, is permanent? Answer 'Yes' or 'No.' ", to which the jury answered "No." "If you have answered Special Issue No. 10 'Yes' and only in such event, then answer:

"13. Do you find from a preponderance of the evidence that said partial incapacity to labor, if any, was not temporary? Let the form of your answer be: 'It was not temporary,' or 'It was temporary,' " to which the jury answered "It was not temporary."

Going back to the general instructions given by the court in its charge we find that the court instructed the jury in part as follows:

"(c) By the term 'total incapacity,' as used in this charge, does not imply an absolute disability to perform any kind of labor but a person disqualified from performing the usual tasks of a workman, in such a way as to enable him to procure and retain employment, is regarded as being totally incapacitated.

"(d) By the term 'partial incapacity,' as used herein, is meant physical disability resulting from an injury which will not produce total incapacity, yet disables one from performing some of the material duties of his employment or other classes of employment which he could have performed but for his injuries, and as a result of which incapacity he is able to engage only in some employment which is less remunerative than that which he would be capable of performing but for the injury, and because of which incapacity he suffers a depreciation in his earning capacity. * * *

"(f) The word 'permanent', as used in this charge, means a condition that will continue throughout life.

"(g) The word 'temporary,' as used in this charge, means any period of time less than permanent.

"You are further instructed that, under the law, a person cannot, at the same time, have both 'total incapacity' and 'partial incapacity'."

In appellee's brief we find this statement:

"It is apparent from the Court certificate that defendant had every opportunity to make known his contention that there was a conflict in the jury's answers between Special Issues Nos. 12 and 13 immediately after the jury's verdict was returned and before the jury was discharged. Counsel for defendant had, when the jury first returned its verdict, claimed that there was a conflict between Special Issues Nos. 12 and 13 and when the verdict was finally returned, answers were the same to Special Issues Nos. 12 and 13 as they were when the verdict was first returned. Therefore, the Court and the plaintiff had every reason to believe that defendant concurred in their belief that the verdict as rendered would substantiate a judgment for seventy-five percent permanent partial disability. Having failed to object at the time, and being fully apprised of the jury's answers to Special Issues Nos. 12 and 13, as is shown by the original objection to the answers to such issues, defendant has now waived its right to claim a conflict between such issues and should not now be heard to complain."

We are not in accord with the conclusions drawn by appellee for reasons which we shall hereinafter briefly state. As we understand the court's certificate, considered along with the statement contained in appellee's brief, the jury made no change whatsoever in any of its answers thereto-

fore made when it was returned to the jury room for further consideration of its verdict. Certainly this is true with reference to Issues Nos. 12 and 13. As we understand the court's certificate, there was no waiver of anyone's rights by the conference that the court had with counsel for appellant and appellee at the time the verdict was returned. After all, it was for the trial court to determine whether or not the verdict of the jury showed a conflict and the court's decision in this respect, under the court's certificate, could be challenged by either appellant or appellee. Therefore, the major question here for us to determine is whether there is a fatal and irreconcilable conflict in the jury's answers to Special Issues Nos. 12 and 13.

In Casualty Underwriters v. Rhone, 134 Tex. 50, 132 S.W.2d 97, 99 (Tex.Com.App., opinion adopted) our Supreme Court announced this rule: "It will never be presumed that jurors intend to return conflicting answers, but the presumption is always to the contrary. Courts properly refuse to strike down answers on the ground of conflict, if there is any reasonable basis upon which they may be reconciled. This is elementary." So the exact question here to be decided is, since the jury found in answer to Issue No. 12 that appellee's partial incapacity to labor was not permanent, and further found in answer to Issue No. 13 that appellee's partial incapacity to labor was not temporary, whether these answers are in irreconcilable conflict. It is our view that they are. Under the court's instructions and definitions given in his charge we see no way to reconcile the jury's answers to Issues Nos. 12 and 13. In appellant's brief we find this statement: "Even in the face of the jury's 'No' answer to Special Issue No. 12, which was the primary issue on which plaintiff needed an affirmative answer to recover judgment for permanent partial disability, the court entered judgment awarding plaintiff permanent partial disability." We are of the view

that the court could not enter such judgment in view of the conflict that existed in the verdict. We have again reviewed the decision of the San Antonio Court in Collins v. Brown, Tex.Civ.App., 279 S.W.2d 627, and this court's opinion in Texas Employers Ins. Ass'n v. Collins, Tex.Civ.App., 290 S.W.2d 693, and the opinion of our Supreme Court in the same cause in Tex., 295 S.W.2d 902, and in view of the discussion found in our Supreme Court's opinion we think the conflict between Issues Nos. 12 and 13 is such that it cannot be cured by a finding of the trial judge, and such view requires that this cause be reversed and remanded.

Since the jury had the conflicts in its verdict pointed out to it and was returned to the jury room for further consideration of the verdict and to resolve the conflicts pointed out and did not do so, we do not believe that the court was authorized to find that the answer of the jury to Issue No. 13 "that plaintiff's partial incapacity 'was not temporary' was tantamount to a finding by the jury of permanent partial incapacity to labor, considering the definition of 'temporary,'"; nor do we think the court was authorized to find that "viewing the answer of the jury to Special Issue No. 13 with the answer to the remaining issues, it is apparent that a verdict for plaintiff for seventy-five percent permanent partial incapacity to labor was intended to be found by the jury and the issues were answered by the jury in a manner clearly sufficient upon which to base a judgment for the plaintiff for such period of time," and that his action in so doing constituted an error that will require a reversing and remanding of this cause. See Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985.

We have considered appellant's third point and it is overruled.

Accordingly, the cause is reversed and remanded.