Eustace HARRIS, Appellant,

v.

J. O. WINSLAR, Appellee.

No. 3569.

Court of Civil Appeals of Texas.

Waco.

May 15, 1958.

Rehearing Denied June 26, 1958.

Gib Callaway, Brownwood, Harry W. Flentge, Gatesville, for appellant.

T. R. Mears, Byron L. McClellan, Gatesville, for appellee.

TIREY, Justice.

Plaintiff grounded this action on the failure of defendant to comply with the terms of the judgment entered in the same District Court in Cause No. 7086, styled Winslar v. Harris, and alleged special damages sustained by him because of the failure on the part of defendant to comply with the foregoing judgment. The court overruled defendant's request for an instructed verdict and the jury found substantially that defendant failed to comply with the terms of the decree required of him, as stated in such decree dated July 10, 1953, between the parties in Cause No. 7086; that such failure on the part of defendant caused more water to flow across plaintiff's land than would have had the defendant fully complied with said judgment, and that such failure resulted in excess water being caused to flow on and across plaintiff's land; that plaintiff had suffered damages to his land by reason of the excess waters caused to flow across his land in the year 1956 and fixed the amount of such damages at $1,242. There were no exceptions or objections filed to the court's charge. The court overruled defendant's motion for judgment non obstante veredicto and entered judgment in favor of the plaintiff on the verdict. Thereafter, defendant seasonably filed his motion for new trial and, it being overruled, he perfected his appeal to this court.

The judgment is assailed on what appellant designates as three points. They are substantially to the same effect: Nos. 1 and 3, that the court should have granted appellant's motion for an instructed verdict because the undisputed evidence is to the effect that no excess water was caused to flow onto and across the lands of appellee by reason of defendant's failure to level down the embankment the full distance of 600 feet, and that no more water did flow across appellee's lands than would have flowed thereon if the judgment had been fully complied with. 2. The court erred in overruling defendant's motion for judgment non obstante veredicto.

A statement is necessary.

Going back to the judgment on which plaintiff's cause of action is based, we find the following recitals: The court "finds as a fact that the natural flow of the surface water from that certain part of the Eustace Harris land described in the Plaintiff's petition and from that certain culvert under State Highway No. 84 described in said petition, is to the Northeast, across a portion of the lands of the said Eustace Harris, and onto and across a portion of the lands of the Plaintiff, J. O. Winslar; and further finds as a fact that in order to restore said flow of surface water to its natural and customary course, it is and will be necessary to remove and level down the embankment or levee on the embankment or levee on the North side of what is known and designated in the pleadings of the parties as the 'Old Highway' from a point beginning at the East end of the dam or wingway constructed by the Defendant, Eustace Harris, immediately South of and above said culvert, and extending Eastward along said 'Old Highway' for a distance of 150 yards, and to lower said grade to such an extent that the water flowing Eastward from the said Harris tank will not be impounded in said old roadway site, but will

flow in a Northeasterly direction across the small four acre farm of the said Harris; and further finds as a fact that a levee or embankment to be at least two feet high after it has settled should be constructed across the Harris four acre field, beginning at a point next to the hill on the South side of said 'Old Highway,' 150 yards East of the East end of said wing-dam, and extending in a Northeasterly direction to an iron pipe set in the Northeast corner of the said Harris four acre farm; the Court further finds that the embankment or levee which now runs along and under the North fence of the said four acre tract of the said Eustace Harris, should be removed and leveled down to a grade even with or below the general surface of said field so that it will not obstruct or impede the flow of surface water to the Northeast from and off of said four acre farm for a distance of at least 200 yards from said iron pipe at the Northeast corner of said four acre farm Westward.

"The Court further finds that the Plaintiff, J. O. Winslar, is entitled to a mandatory injunction against the said defendant, Eustace Harris, ordering and commanding the said Eustace Harris, at his own expense, to remove and construct said embankments and levees in the manner and to the extent hereinabove set out." The court then decreed: " * * * that the Defendant, Eustace Harris, within a period of four months from this date proceed, at his own expense, to build, construct, remove and modify the said levees, embankments and grades in the manner and form in all things as hereinabove set out and described, and in the event of his failure or refusal so to do, then in that event the Court will appoint a receiver to do and perform said work and all of the expense of so doing shall be charged against the Defendant as costs of this suit."

Plaintiff went to trial on his original petition. In paragraphs 10 and 11 we find substantially these allegations: That defendant failed to comply with the judgment here referred to and on the contrary, erected a levee from just east of the dam where the water was diverted to the northeast corner of plaintiff's property, and failed and refused to lower the levee and guards along the highway for a distance of 200' yards as provided for in said judgment, which action prevented the water from flowing in a northeasterly direction toward its natural channel, as provided in the judgment; that on the 1st day of May 1956 heavy rains came on the watershed of the branch where the dam was constructed; that these heavy rains created a flooding condition, and that the flood waters ran down the side of the levee to the corners where plaintiff's and defendant's properties join at the intersection of the Pearl Road, and the flood waters ran across the field of the plaintiff on the south of Highway 84, washing gullies and trenches across plaintiff's property; that the flood waters covered half of the field and formed a lake near its east end, covering some four acres of land; that the flood waters washed gravel, sand, and Johnson Grass roots on his field; that the top soil was washed off of said land down to the hard surface.

Defendant went to trial on his original answer and his trial amendment. His original answer contains a general denial, and in his answer, among other things, he pleaded substantially that in the event it should be true that any portion of said water was carried across the plaintiff's premises as he alleged, that it was in such small volume as to do no material injury; that lying to the south of the paved highway and running in a northerly and southerly direction along the line between plaintiff and defendant there is a county road, and the ditches on the side of the road collect the waters coming from the south from the hills and raised ground, and but for this road would naturally flow onto and across the land of plaintiff and would never reach or touch the land of defend-

ant, and that such waters are collected and funnelled by the road ditches in large volume onto the land of defendant and onto the four acre field, and that but for the construction of the road and drainage ditches, the water would naturally flow onto and across the land of plaintiff, and the flood waters so diverted on the land of defendant by the county road would otherwise flow onto and across plaintiff's land, and that this water from the drainage ditches is much greater in volume than any water flowing from the lands of defendant onto that of plaintiff, which he alleges was caused by the diversion dam, and that under all the facts and circumstances the defendant suffered greater damage from wrongful diversion of water from plaintiff's land than any damage to plaintiff from the lands of defendant. Defendant, in his trial amendment, specifically plead the judgment entered in Cause 7086, styled Winslar v. Harris, heretofore referred to and set it out in haec verba, and averred that it was still binding on plaintiff and defendant.

He specially averred that immediately after the date of the judgment, he went upon the four acre field and removed and levelled the embankment along the north side of the old public road, as directed by the judgment; that he then built and constructed the levee or embankment to a height of more than two feet after that was settled across the four acre field, exactly as required by the judgment; that, however, an unusual flood in the Spring of 1954 overflowed the levee and that he thereafter went upon the field and raised and rebuilt the embankment or levee to a height of about five feet after it was settled, and that no water had ever flowed over such embankment since it was so rebuilt; that such rebuilding was completed approximately two years before the flood complained of in May 1956, and he avers that no water from the 1956 flood flowed over the embankment; that at the time he rebuilt the levee defendant removed and levelled down the embankment along the south side of Highway 84 at the northeast end of the levee at the iron pin named in the judgment, for a distance of about 20 yards, such opening being sufficiently wide to accommodate the flow of all water coming from plaintiff's four acre field by reason of the unusual flood in May 1956; that at the time of this flood defendant had not levelled the embankment on the south side of Highway 84 along the north fence of his four acre field, which he was ordered to remove for a distance of 200 yards west from the iron pin at the northeast corner of his farm; that defendant's failure to remove such embankment for a distance of 200 yards did not, because of the nature of the terrain, enlarge in any degree, the amount of water that would flow or could pass from the defendant's four acre field into the lands of the plaintiff, over the amount that would have flowed onto and across the plaintiff's land if said embankment had been removed the full distance of 200 yards; that this was true because the opening of 20 yards made by the defendant at the northeast end of said diversion dam was sufficient to accommodate the passage of all the flood waters. Defendant says the foregoing averments show that he fully complied with every material requirement of the judgment entered between plaintiff and defendant under date of July 10, 1953, and that by reason thereof he is not liable in damages to the plaintiff.

■ Before discussing appellant's points, we think it is pertinent for us here to say that as a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3-B Tex.Jur. pp. 370 and 372. See also Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, points 1 and 2, 23 A.L.R.2d 1114; Liedeker v. Grossman, 146 Tex. 308, 206 S.W.2d 232, points 4, 5 and 6. Moreover,

"Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9, writ ref. Moreover, "'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable."'" See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, at page 199, point 6. No rule is better settled than the one to the effect that if there is evidence of probative value to sustain the findings of the jury, the appellate court is bound by such findings. See Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, point 3 (no writ history) and cases there collated. See ICT Ins. Co. v. Gunn, Tex.Civ.App., 294 S.W.2d 435, point at page 441, (n. r. e.); Continental Cas. Co. v. Baker, Tex.Civ.App., 297 S.W.2d 706 (N.R.E.). See also Texas Employers Ins. Ass'n v. Brown, Tex.Civ.App., 309 S.W.2d 295, n. r. e.

(As we understand appellant's contention, it is to the effect that he is entitled to have this judgment reversed and rendered solely on the ground that there is no evidence to sustain the jury's answers to the issues submitted to them. He makes no contention that the evidence is insufficient, nor that such evidence is so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust and by reason thereof, does not bring himself within the doctrine announced by our Supreme Court In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; however, we have considered it).

Going back to a discussion of the testimony tendered, we find various maps introduced showing the land and the highways, and the data relating to the various grades, and the dam and drainage ditch complained of, which were tendered in evidence for the benefit of the jury. Plaintiff, in addition to himself, tendered seven other witnesses. These witnesses testified as to the fact that they were familiar with the location of the land of plaintiff, as well as the land of the defendant, before the construction of the highway and after defendant built the dam and drainage ditch referred to by the witnesses as the diversion channel.

Mr. Raymond Winslar, son of plaintiff, testified to the effect that he had farmed his father's place since 1939 and he was familiar with the general drainage area out there on both his father's farm and Mr. Harris' farm; that he was familiar with how that land drained prior to the erection of the dam; that the water from Mr. Harris' field and immediately south of the dam did not drain into the field owned by his father, prior to the erection of the dam and diversion ditch; that the State Highway put in the culvert in the fall of 1938 or 1939, that is on 84; that there was a natural drainage at such point and they made the culvert large enough to carry the flow of the water that came through this natural drain; that the construction of the culvert gave the water a straight line in which to drain, and the only way to change the flow and make it run in the other direction was to put a levee to turn it, and that is what Mr. Harris did; that the pin indicated on the map is a piece of pipe four feet high near the fence line; "it is what you all refer to as the iron pin; that is the approximate direction in which Mr. Harris has erected the levee that now carries this water. Mr. Harris has not moved that levee from the spillway of the dam to the iron pin, except right here at

the end at a distance of about, I would say, 15 feet, * * * that 15 or 20 feet that he levelled down is all that he ever did." He further testified to the effect that the diverted water washed the field; that "the field was all right until that flood got on it, * * *" and "it isn't hard to this day to tell where the water came; just plowed it and swept it off clean to the hard dirt;" that he lost a good two acres of top soil; that there was damage to the land on the south side; that in the northwest corner there is a hole washed out somewhere around eight feet, and "I would say about 20 feet long, eight to ten inches deep;" that as a result of the flood damage he estimated it from one-half to two-thirds of the 20 acres south of the highway.

Mr. Lloyd Hancock testified to the effect that he was maintenance foreman for the Texas State Highway, and had held that position about 33 years, and that he was familiar with the tracts of land in question; that as to the drainage from the Harris land in this area south of the present dam, it drained down. He further testified to the effect that he had occasion to do some work out there on the highway after the rains in May of last year; that he found the shoulder of the road was washed, and there were chunks and logs on the highway, and also water was on the highway; that the water was deep enough to wash across the road at that point; that there was water in Mr. Winslar's field on both sides of the highway; that he had to send a crew to get the driftwood off the road, and he had to have the shoulders bladed; that he didn't know how long the culvert constructed by the Highway Department was used before this levee was built, but it wasn't too long; that the water was diverted from its natural channel back this direction (indicating).

Mr. Curtis Smith, County Commissioner of the precinct, testified to the effect that he was familiar with the land in controversy and that the upkeep of the Pearl Road was under his supervision; that he was coming down the highway in May of 1956 when we had the extensive rains, and had occasion to see the condition of the road and, with reference to whether there was some water in them, he said it was flooded quite a bit and quite a few logs were out in the highway; that part of that water was running across the road and part coming down the road and into Winslar's field, and part was going on defendant Harris' field at the same time; that part of such water was going into the 20 acre field south of the road, and that the water was coming down the diversion ditch, and that the water was coming from the dam that Mr. Harris built down to the intersection of the Pearl Road and Highway 84, and that is where the logs and debris were coming from; that this dam was built by Mr. Harris after he (Smith) was commissioner; that before the dam was built the water came through a culvert right here (indicating) and down through the field to the creek; that the water came under the highway through the culvert, where there was an old one under No. 7, now 84; that the changes in the course of the water was caused by the dam; that the dam was put right above the culvert and the spillway was put on the east side; that Mr. Harris constructed a levee there, or ditch, that carried the water down approximately to the intersection of the Pearl Road and 84; that in May 1956 the surface water overflowed off of this dam through this field and down these levees and across the highway; that he was out there at the time this water was coming down and saw that logs and drift were coming off of the levee rather than the Pearl Road. "Q. I will ask if prior to the diversion of this water there was a drainage problem there? * * * A. Well, not too much of a problem up there on the county road. There wasn't too awful much water got in there. There could have been times at flood stage, there could have been water trouble, but not since I have been Commissioner. No, I had not seen that condition during the time I was Commissioner prior to the construction of this levee by Mr. Harris." Mr. Smith further testified to the effect that there "might be a little drainage goes through there down from the highway. It no longer uses this

culvert. Yes, the reason is, it has been diverted. Yes, the drainage that created the flood condition was water that would normally have flowed down this channel. (Indicating on the plat). Yes, had this drainage ditch not been constructed by Mr. Harris."

Dick Forest testified to the effect that he was in the highway maintenance department; that he was familiar with the culvert immediately to the north of this dam; that prior to the erection of this dam, the direction of the water was from here to here, but that there is not any drainage through there now; that that drainage was terminated by the construction of the levee and the building of this diversion ditch. He further testified to the effect that if the dam had not been built, the water would have come down from this area in the Harris field, across the Harris field into the Cow House Creek instead of the way it is presently diverted.

Mr. Troy Smith, a school bus driver, testified to the effect that he came on the highway in a car while the water was over the highway and that the water was out on the highway "pretty bad" and was running into Mr. Winslar's field at the corner of his field and that "this field was just a lake of water. The flood waters were running in at the time it was coming fom Mr. Harris' ditch there, around that levee. Yes, there was a constructed levee around Mr. Harris' property south of the highway there. Well, this water would have to flow from the dam around the levee coming from that branch and around that levee."

Mr. Harris, the defendant, testified in part with reference to the construction of the new highway; that he asked for an underpass for his stock to go across the road, and that the Highway Department put that big culvert in for an underpass, and that they dug out a wide channel and turned the water through the culvert; that the channel was eight or ten feet wide and four or five feet deep; that they cut the channel back into his pasture for a distance of around 100 or 150 feet; that this excavation gathered and collected and carried through the culvert more water than would have naturally run through there; that before that channel was cut, the water came down and of course it drained off to the northeast; that when it hit the old road it went east for a little ways, but when it got to the corner it hit Mr. Winslar's line going into his (Mr. Harris) field and Mr. Winslar's and across his land; that he started his diversion levee under the judgment of the court and began at the corner of what has been referred to as his four acre patch; that when he constructed this levee it turned the water down to the highway; that the judgment provided for him to level down this embankment on the south side of the highway a distance of 200 yards from the corner back to the west, and "I levelled it down 85 steps. The reason I did not level it further, the full 220 yards, was it went to raining * * * the water did not came over Mr. Winslar's side from the embankment I made. I had built it a few days after the date of the judgment. I did not build it as high as it is now. It called for 24 inches. I thought I built it fully high enough but it came a big rain and went over. That was before 1956. Then I came back and went up next to the hill and built the dam up. I would say, 5 or 6 feet. This levee is from the hill to the highway. No water has ever run over it since I put that on." With reference to the May flood, 1956, he said: "None of that water ran over this diversion ditch or dam that I had. Water could not get over that side of the levee on my land and into Mr. Winslar's field. It comes in the highway ditch. It is low and turns back up this Pearl road, across this Pearl road and back to a low place at that corner (indicating on aerial map). And from that borrow ditch and then into Winslar's field, yes. * * * I went down there to that corner while the flood was at its height in the May flood of 1956. I saw the log that is shown in the photograph there at the corner of Winslar's field. It came from right up this Pearl road right there next to the hill. I know the log; it was on my place. * * * I know

where that particular log came from; on what was the old road and on down across my field. I was there and watched that flood and saw the water during and after that rain. At the time of the flood the water ran over back to where I had not taken that ridge off; it went over the ridge. If I had cut the ridge back the full 200 yards as stated in the judgment, all the difference it would have made is, there was some water left in my field that would have gone out. Just not quite as much water went off of my place, that is right. It left a pool that would have gone into the borrow ditch. I couldn't see where it would have made much difference as to water running into the Winslar field. It would have been a little more water if it had all drained out." * * * "My failure to go the full distance required by the court, cutting down that borrow ditch on the south side of the road, would not have increased the water that was thrown on Mr. Winslar. It held a little off. * * * I did not put this dam there to divert it over to Mr. Winslar; nor to divert it back the way it went before the highway was there." He further said: "The only thing I can remember is that when that small culvert was put in there it was dredged out by that branch a little and then when they put in the new road and put this underpass in there they dredged that out some 50 feet, 8 or 10 feet wide and 4 or 5 feet deep. That was when they turned the water through there. The water had not washed or bothered my land until that new highway was built and this new culvert was put in there, and the extended excavation, etc. That was what I was guarding against, that increased flow of water." He further testified to the effect that he did not cut the diversion ditches to carry the water down that new underpass; that he was trying to keep it from coming in there; that he built the diversion ditch across the field because the court ordered him to, and he had to do it to comply with the court's judgment. "Q. The fact that you did not fully comply, cut 85 yards off and the court ordered you to cut 200, could that in any possible manner affect the ultimate amount

of water that would go on Mr. Winslar? * * * A. I don't think so. I don't think it caused any additional."

As we understand Mr. Harris' testimony, it is to the effect that under all the surrounding facts and circumstances, his failure to comply fully with the court's decree entered in 1953 had no effect on the amount of water that flowed onto plaintiff's land. Needless to say, under all the surrounding facts and circumstances, that was the controlling fact question in this cause, and the jury heard the witnesses, saw the maps tendered in evidence and had the opportunity and duty to decide this fact question. Their verdict was adverse to appellant.

Going back to the applicable law hereinabove cited, we think a jury question was tendered by the pleading and the evidence, and we think the evidence is sufficient to sustain the jury's answers to each of the issues submitted to them. And notwithstanding the fact that appellant has not invoked the doctrine announced in In re King's Estate, supra, we have considered all of the testimony and the record with reference to the sufficiency of the testimony and, as stated above, we think that it is sufficient to sustain the jury's verdict.

As we understand appellant's oral argument, it is to the effect that since he introduced maps showing substantially by these maps that the elevations and contours of the land shown on these maps were such that excess surface water could not have overflowed on appellee's land, the failure of the appellant to comply with the judgment entered against him in 1953 did not cause appellee's damage. We overrule this contention. Our courts have consistently held that opinion testimony does not establish any material fact as a matter of law. See Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345.

Accordingly, the judgment of the trial court is in all things affirmed.

HALE, J., took no part in the consideration and disposition of this case.